## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**LUIS E. MEDERO-GONZÁLEZ,**

    **Plaintiff,**

      **v.**

**THE BALDWIN SCHOOL OF PUERTO RICO, INC., ET AL.,**

    **Defendants.**

**CIVIL NO. 20-1527 (PAD)**

### OPINION AND ORDER

Plaintiff Luis E. Medero-González sued his former employer, The Baldwin School of Puerto Rico, Inc., and its insurer, AIG Insurance Company – Puerto Rico, alleging that he was terminated in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and Puerto Rico law (Docket No. 18).[1]  Baldwin answered the Amended Complaint denying liability, alleging in part that plaintiff was let go after an independent investigation found him responsible for a then recent wave of cyberattacks at Baldwin (Docket No. 22).  Upon conclusion of discovery, Baldwin moved for summary judgement (Docket No. 54), which plaintiff opposed (Docket No. 57).  Baldwin replied (Docket No. 62), and plaintiff surreplied (Docket No. 69).  For the reasons explained below, the motion for summary judgment must be granted and the case dismissed.

### I.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no

---

[1] Specifically, Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29, §§ 146 et seq. ("Law 100"), Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, §§ 194 et seq. ("Law 115"), Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a-185m ("Law 80"), and Article 1802 of the Puerto Rico Civil Code of 1930, P.R. Laws Ann. tit. 29 § 5141 ("Art. 1802").

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 2

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56(a). A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Material issues are those that have "the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dept. of Just., 355 F.3d 6, 19 (1st Cir. 2004). All "reasonable factual inferences" must be drawn in favor of the party against whom summary judgment is sought. Shafmaster v. U.S., 707 F.3d 130, 135 (1st Cir. 2013).

To resist summary judgment, the nonmovant must do more than show "some metaphysical doubt as to a material fact." Matsushita Elec. Inds. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Even in cases of employment discrimination where courts must parse "elusive concepts such as motive or intent," summary judgment is appropriate where the nonmovant relies only "upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). After a thorough review of the record, there is no genuine dispute as to the material facts identified in the section that follows.

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 3

## II.        FACTUAL FINDINGS[2]

### A.        Parties

Baldwin is a private non-profit, non-sectarian, international, college preparatory school.

See, "Statement of Uncontested Material Facts as to Which There is No Genuine Issue to be Tried"

(Docket No. 53, ¶ 2) ("DSUMF"); "Plaintiff's Answers to Defendant's Statements of Uncontested

Facts and Plaintiff's Additional Statement of Uncontested Material Facts Which Further Prevents

this Court from Granting the Relief Requested by Defendant" (Docket No. 58, p. 1, ¶ 2)

("POSUMF").  From March 2005 until he was discharged around November 12, 2019, plaintiff

worked as a technology assistant at Baldwin's IT Department (DSUMF, ¶¶ 1, 75; POSUMF, ¶¶ 1,

75).[3]  Plaintiff's national origin is Puerto Rican, and he identifies himself as black.  See,

"Additional Statement of Uncontested Facts" (Docket No. 58, p. 35, ¶ 22) ("PASUMF");

"Opposition to Plaintiff's Additional Statement of Uncontested Material Facts" (Docket No. 63, ¶

22) ("DOSUMF").  Similar to plaintiff, most of the employees at Baldwin are also of Puerto Rican

and Hispanic origin (DSUMF, ¶ 32; POSUMF, ¶ 32).

### B.        First Allegation of Discrimination

Shortly before the end of the 2018 summer break, Baldwin needed assistance to complete

---

[2] The facts are drawn from the parties' Local Rule 56 submissions (Docket Nos. 53, 58, 63).  Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Cap. Mkt. Inv. LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).  It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material. Local Civ. R. 56(b) and (e).  The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. Id. 56(c) and (e).  Here, the court reviewed every factual statement and counterstatement that the parties submitted plus supporting exhibits and included in this Opinion and Order those facts that are material to the case and were incorporated in statements that comport with summary judgment principles.

[3] In their briefings, plaintiff refers to November 12, 2019, as the termination date while Baldwin uses November 14, 2019 (DSUMF, ¶ 75; POSUMF, ¶ 75).  November 14th is the date a letter confirming his termination was sent to plaintiff (Docket No. 53-25).  However, the record reflects he had been fired in a meeting a few days prior and the letter was drafted afterwards for unemployment purposes upon plaintiff's request (Docket No. 53-4, pp. 143-144).

a task involving a program called Managebac, a technological platform used to manage classes, schedules, and grades (DSUMF, ¶¶ 15, 17; POSUMF, ¶¶ 15, 17).[4]  Up to that point, dealing with Managebac had generally been the domain of Baldwin's former IT Director, but due to health reasons he was unable to complete the task that year (DSUMF, ¶ 16; POSUMF, ¶ 16).  Faced with the start of a new semester, Baldwin's headmaster at the time, James Nelligan, tapped plaintiff for help given that he had previously informed Mr. Nelligan that he would like more opportunities for professional growth (DSUMF, ¶ 18; POSUMF, ¶ 18).

Traditionally, Baldwin offers additional compensation to members of faculty that engage in extracurricular activities in the form of stipends (DSUMF, ¶ 30; POSUMF, ¶ 30).[5]  As such, aware that the request was made on short notice and that plaintiff had no previous experience with Managebac, Baldwin offered plaintiff an economic incentive of around $5,000 to tackle the situation (DSUMF, ¶ 17; POSUMF, ¶ 17).  Plaintiff accepted the task and the incentive, but ultimately was unable to finish it on his own and another employee stepped in to complete the task (DSUMF ¶ 19; POSUMF, ¶ 19).

By the summer of 2019, Baldwin had hired a new IT Director, José Luis Rodríguez, who

---

[4] Plaintiff routinely attempts to deny many statements of facts by claiming they are not supported by the evidence and citing to deposition transcripts, despite the deposition transcripts not contradicting and even confirming Baldwin's statements (DSUMF, ¶¶ 15-19; POSUMF, ¶¶ 15-19). After careful review of the cited transcript excerpts, the court fails to see how they contradict DSUMF ¶¶ 15-19, and as such, they are deemed admitted.

[5] In attempting to deny this statement, plaintiff cites to a table of stipends paid by Baldwin during the 2020-2021 academic year (POSUMF, ¶ 30).  According to plaintiff, the table of stipends shows that teachers in the blue column are paid extra for activities that are related to their job description.  Id.  Yet, he does not describe how he reaches that conclusion.  The stipends table provided by both parties contains the names of what appear to be faculty members at Baldwin and includes the amount paid to each one (Docket No. 58-10).  Alongside the amount, the blue column includes brief notes explaining the reason for the stipend (e.g. "Science Subject Leader," "Spanish Subject Leader," "PE Subject Leader," and other leadership roles along that nature).  Id.  It is unclear what any of these leadership positions entail and whether they are within or beyond the bounds of these teachers' job descriptions, as the stipend tables were presented without much explanation from either plaintiff or Baldwin (Docket Nos. 53-11, 58-10).  In any case, whether or not these leadership roles were related to these teacher's job descriptions does not negate Baldwin's statement that stipends are paid for extracurricular activities.

sought the help of plaintiff to again deal with the Managebac program (Docket No. 53-6, p. 18).[6] However, plaintiff did not readily accept the task.  Upon plaintiff's apparent refusal to take on the assignment, Mr. Rodríguez raised the matter with Baldwin's HR Director, Linette Torres.  Id.  So, on July 1, 2019, Ms. Torres held a meeting with both Mr. Rodríguez and plaintiff to discuss the Managebac assignment (DSUMF, ¶ 22; POSUMF, ¶ 22).  In the meeting, plaintiff objected to taking on the assignment without further compensation because it was traditionally a task for the IT Director (Docket No. 58-2, p. 21).  To plaintiff's way of thinking, it was a task that was beyond the bounds of his duties and would warrant extra pay.  Id.  Ms. Torres informed plaintiff that he had been given a stipend in 2018 due to the urgent nature of the request at that time (DSUMF, ¶ 22; POSUMF, ¶ 22).  But, no exigent circumstances existed in the summer of 2019, and it was something within the scope of plaintiff's employment.  Id.  Hence, Baldwin reasoned that it was a task that the IT Director could reasonably delegate to plaintiff.  Id.

The meeting went in circles, with Ms. Torres repeatedly asking if plaintiff was going to perform the assignment, to which he always responded that doing so without additional compensation was "very unfair" (Docket No. 58-2, pp. 36-37).  As the impasse continued, plaintiff's patience seemed to wane and he began to complain about Baldwin and Mr. Rodríguez, which led him to ask if the reason he was not being given a stipend on this occasion was because of the color of his skin or because he was Puerto Rican. Id. p. 45.[7]  Shortly thereafter, the meeting

---

[6] Many of the documents submitted as exhibits have their own internal page numbers in addition to the page numbers automatically stamped by CM/ECF.  For the sake of consistency, throughout this Opinion and Order the court will only cite to the CM/ECF page numbers.

[7] On making this claim, plaintiff admitted that he had no personal knowledge at the time that white American employees were in fact treated differently at Baldwin but he "imagined they did" (Docket No. 53-1, p. 30).  Plaintiff then went on to make the bold assertion that he was later able to confirm through the discovery process that white-American employees at Baldwin did receive a "special stipend," yet, no such evidence was brought before the court. Id.; POSUMF, ¶ 31.  Rather, what the evidence reflects is that employees from all walks of life receive stipends at

devolved into finger-pointing, with plaintiff accusing Mr. Rodríguez of being incompetent at his job and challenging him to prove his technological knowledge at the meeting by performing a live demonstration with some cables (DSUMF, ¶ 26; POSUMF, ¶ 26).[8]  Plaintiff continued peppering Mr. Rodríguez with technical questions, at which point he became noticeably upset, and told plaintiff something along the lines that if he continued, they were going to "have a problem" (Docket Nos. 58-2, p. 25; 58-4, p. 72).   In response, plaintiff stood up and approached Mr. Rodríguez to ask him "what kind of problem [they] were going to have" (Docket Nos. 58-1, p. 13; 58-2, p. 25).   At that point, Ms. Torres immediately ended the meeting and sent both men to their respective offices to cool down (DSUMF, ¶¶ 26-27; POSUMF, ¶¶ 26-27); see also, Docket Nos. 58-2, pp. 20-22, 33-35; 58-4, p. 55).

The July 1st meeting and the events that transpired there are, for the most part, uncontroverted.  Aside from some minor quibbles, their accounts of what actually occurred are almost entirely identical (DSUMF, ¶¶ 22-28; PASUMF ¶¶ 18-33).  Where the parties' versions of the events largely differ is in how these events are framed.  Broadly speaking, Baldwin paints the picture of an employee who felt scorned because he had not been promoted in favor of someone whom he viewed as less capable than him (DSUMF, ¶¶ 22-28).  In this context, upon being asked to handle a task which was traditionally managed by the IT Director without additional compensation, plaintiff went on a scorched-earth tirade against his employer and only mentioned the alleged discrimination as an off-hand comment among a litany of other gripes (Docket No. 62,

Baldwin (not just American employees), with the overwhelming majority of these payments going to the school's Hispanic employees (Docket No. 58-10).

[8] Plaintiff again attempts to deny defendant's statement by including a lengthy citation to the deposition transcript, but the cited excerpt fails to controvert or discredit Baldwin's characterization of plaintiff's testimony and the record (POSUMF, ¶ 26).

pp. 6-7).   Conversely, plaintiff's portrayal of the events frames his actions as an honest and dispassionate report to Baldwin of his legitimate concerns of discrimination, not as it actually devolved into: a borderline verbal altercation between plaintiff and Mr. Rodríguez (PASUMF, ¶¶ 18-33).

### C.    Alleged Acts of Retaliation

In plaintiff's view, immediately after his comments at the July 1st meeting, Baldwin retaliated against him as described below, for disclosing his concerns of discrimination (Docket No. 57, p. 15).   As a result, on August 12, 2019, he filed an initial charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (Docket No. 53-18).

### 1.    Suspension

Commencing on July 2, 2019, Baldwin suspended plaintiff for 5 business days (DSUMF, ¶ 29; POSUMF, ¶ 29).   As part of the suspension, Baldwin removed plaintiff's access to the school's IT network and took away his work phone (DSUMF, ¶ 34; POSUMF, ¶ 34).[9]   Because Baldwin staff were out for the summer break, plaintiff could not return to his duties until August 2, 2023, when the summer break concluded (DSUMF, ¶ 29; POSUMF, ¶ 29).   After the suspension, Baldwin returned the access credentials and authorizations to plaintiff (DSUMF, ¶ 35; POSUMF, ¶ 35).   Baldwin maintains that plaintiff was returned full access (DSUMF ¶ 35; DOSUMF, ¶¶ 69-70).   In contrast, plaintiff posits that he was never given proper access to the systems needed to effectively do his job (PASUMF, ¶¶ 69-70).   It does appear that there were some systems which plaintiff was unable to access (Docket No. 58-1, p. 12).   Nonetheless, the record reflects that Mr. Rodríguez himself provided plaintiff with new access credentials upon his return (Docket No. 53-

---

[9] Both parties agree that Baldwin removed plaintiff's accesses and credentials after suspending him but plaintiff objects to Baldwin's claim that it was done as a security measure.  Id.

13).   And, plaintiff admitted that he was able to completely fulfill his day-to-day tasks, an impossible ordeal if, as he claims, he did not have access to the school's systems (PASUMF, ¶¶ 66-68).

### 2.  PIP

After plaintiff returned from his suspension, Ms. Torres and Mr. Rodríguez met with him, expressing that in addition to the suspension, he would be placed on a Performance Improvement Plan ("PIP") as a result of his conduct at the meeting (DSUMF, ¶ 44; POSUMF, ¶ 44).  The stated goal of the PIP was to address plaintiff's refusal "to perform assigned tasks" and establish goals for him to complete within a period of around 93 days (Docket No. 53-17).  Also, the PIP required plaintiff to have follow up meetings with Mr. Rodríguez every two weeks or so to discuss his progress on the listed tasks.  Id.  The parties quarrel somewhat about the degree to which plaintiff actually completed the PIP (DSUMF, ¶¶ 47-48; POSUMF, ¶¶ 47-48).  Plaintiff contends that he completed 100% of the PIP while his supervisor, Mr. Rodríguez, claims there were still some minor issues to address.  Id.

### 3.  Employment Contract

While plaintiff was employed at Baldwin, his contract was renewed on a yearly basis (DSUMF, ¶ 3; POSUMF, ¶ 3).  For the academic year of 2019-2020 plaintiff signed a contract on June 19, 2019 (DSUMF, ¶ 13; POSUMF, ¶ 13).[10]  The contract, much like the ones he had signed in previous years, classified him as an exempt employee for purposes of overtime (Docket Nos.

---

[10] Plaintiff posits that he signed the document on June 19, 2019, and that the date on the document was later amended by another person to July 19 (POSUMF, ¶ 13; Docket No. 53-7).  Reviewing the document, the date on the contract does appear to have been written over although it is impossible to conclude with certainty who made the change or if it was changed from June to July or vice versa (Docket No. 53-7).  Regardless, there is no controversy as to whether plaintiff in fact signed the document before Baldwin decided to draft a new one.  Thus, the exact date of his signature is immaterial.

53-3, 53-7). However, plaintiff was informed that the contract was being updated to change his status from exempt to nonexempt and on August 9, 2019, was given an amended contract to reflect the change (DSUMF, ¶ 40; POSUMF, ¶ 40). Most of the terms and conditions of plaintiff's employment, including his salary and hours, would remain unchanged under the new contract, with the only caveat being that he would now have to clock in and out for his lunch period. Id.[11] But, plaintiff never signed the new contract asserting that the contract he had signed in June 2019 was still valid. Likewise, he refused to comply with Baldwin's request to punch in and out for lunch (DSUMF, ¶ 43; POSUMF, ¶ 43).[12]

### D.   Hacking Incidents and Plaintiff's Termination

#### 1.   Hacking Incidents

Around this time, Baldwin faced challenges related to the security of its network infrastructure. Before the summer of 2019, external actors had hacked Baldwin's Managebac platform (DSUMF, ¶ 52; POSUMF, ¶ 52). Further, Baldwin experienced a phishing event to commit a financial transaction that would have exposed Baldwin to financial theft had its banking institution not intervened (Docket No. 58-3, p. 14). After these incidents, Baldwin made efforts to improve its network security infrastructure. Id. pp. 13-14, 96. On September 8, 2019, however, Baldwin's email users received an email from a student's account claiming that Baldwin's domain along with 700 email addresses had been compromised and that sensitive information would be

[11] He would also, presumably, be eligible for overtime pay.

[12] There is a dispute in the record about what spurred Baldwin's decision to reclassify plaintiff as nonexempt employee. Baldwin avers that it realized that plaintiff was misclassified because, during his July 1st outburst, one of the many gripes he allegedly brought up was that he did not make enough money to be classified as an exempt employee (DSUMF, ¶ 36). According to Baldwin, after looking into the issue, it realized that plaintiff had in fact been incorrectly classified as an exempt employee and sought to rectify the matter with an amended contract. Id. Meanwhile, plaintiff affirms that, to his best recollection, the first he ever heard of the matter was upon returning from his suspension when the new contract was brought before him (POSUMF, ¶ 36).

released unless the hacker received a transfer in bitcoin equivalent to $20,000 Mexican Pesos within 24 hours (DSUMF, ¶ 53; POSUMF, ¶ 53).  This event led to a further tightening of Baldwin's network security measures, including enabling two-factor authentication on Baldwin email accounts (DSUMF, ¶ 54; POSUMF, ¶ 54).

Still, on October 21, 2019, suspicious emails were sent from two staff accounts after irregular log-in activity from United Kingdom-based IP addresses (Docket No, 53-21, p. 11).  As a preventative measure, Baldwin immediately restricted the user accounts until the matter was resolved (DSUMF, ¶ 56; POSUMF. ¶ 56).[13]  Fearing that a potential cybersecurity crisis was brewing, Baldwin contacted the FBI to inform the agency of the situation and request its assistance (Docket No. 58-6, p. 7).[14]  And, by October 22, 2019, Baldwin retained the services of GM Security Technologies ("GM") to investigate the "anomalous behavior in [Baldwin's] internal IT system and platforms" (Docket No. 53-21, pp. 4, 29).

On November 3, 2019, while GM's investigation was underway, an email was sent from plaintiff's work email account to all users within the Baldwin domain stating: "This system has been hacked and all security accounts on this domain are compromised. We are anonymous" (Docket No. 53-22).  As Baldwin had done with previous users, it restricted plaintiff's account

---

[13] In an attempt to deny Baldwin's statement of fact, plaintiff makes the blanket claim that it is "not supported by the evidence," without further elaboration (POSUMF, ¶ 56).  Nonetheless, the statement is supported by the deposition transcript of Mr. Rodríguez, whose account on this matter plaintiff did not dispute (Docket No. 53-6, p. 23).

[14] Plaintiff frames Baldwin calling in the FBI after the Fall 2019 wave of cyberattacks as further retaliatory conduct by suggesting that Baldwin referred him to the agency as punishment for complaining of discrimination (Docket No. 57, p. 9).  Still, what the record reflects is that Mr. Rodríguez called the FBI with a general request that the agency assist Baldwin with what it believed at the time to be a potentially serious data breach (Docket No. 58-1, pp. 4-6). The FBI visited Baldwin, met with members of management and made some inquires but ultimately decided not to pursue the matter and no criminal charges came about from its involvement (Docket No. 58-3, pp. 97-100).

until the issue was resolved (Docket No. 53-6, pp. 22-23).[15]   Shortly thereafter, however, Baldwin's printers were made to print out hundreds of pages of propaganda for the "Anonymous" hacking group but the device with which they were accessed was never found (DSUMF, ¶¶ 62-63; POSUMF. ¶¶ 62-63).[16]   Furthermore, during November 2019, an unauthorized user managed to gain access to Baldwin's network to remotely disable DVR and CCTV platforms (DSUMF, ¶ 65; POSUMF. ¶ 65).[17]   In light of the uptick of network attacks, Baldwin retained the services of another third-party company by name of the Data Core to investigate the hacking incidents alongside GM (Docket No 53-24).

### 2. Investigation Reports

Both Data Core and GM issued reports detailing the findings of their investigations (Docket Nos. 53-21; 53-24).   The first report was Data Core's "Incidents, Traffic and Spam Assessment Report" (Docket No. 53-24).   Among Data Core's findings were that the "Anonymous" message sent from plaintiff's email account was generated by the actual user (i.e., plaintiff) but that it could not find any proof of that activity in plaintiff's work laptop because the user had performed a "wipeout" of the unit.   Id. p. 2.   On this basis, Data Core concluded that plaintiff used tools such as "Tor" and "VPN," as well as his knowledge of IT and Baldwin's network infrastructure to "gain access to the print server, switches and email system with the outcome of causing chaos all over the institution" all while pinning it on the "Anonymous" hacker group.   Id. p. 3. Additionally, after

---

[15] Plaintiff took great offense to his account being temporarily blocked and sent an email from his personal account to Ms. Torres and other Baldwin staff accusing Mr. Rodríguez of accessing his work email account and implying that Mr. Rodríguez was the author of the suspicious message (Docket No. 53-23).

[16] Plaintiff does not deny that the incident occurred but denies DSUMF, ¶ 62 arguing that there is no evidence that the printer incident occurred on precisely November 6, 2019 (POSUMF, ¶ 62).

[17] Again, plaintiff objects to the stated date but not the veracity of the incidents themselves (POSUMF, ¶ 66).

the inspection of the "Network Interface Card" of the laptop assigned to plaintiff, Data Core concluded that plaintiff had in fact accessed "high-risk applications" such as "Tor." Id. p. 5.

By December 2019, after plaintiff had been terminated, Baldwin received GM's incident report which made less conclusive statements than those reached by Data Core (Docket No. 53-21). With regards to plaintiff, GM was unable "to pinpoint who gained access to Baldwin's external platform systems." Id. p. 37. However, GM found that there existed "no evidence or indication that [plaintiff's] account was compromised" by an external actor because the account had enabled multi-factor authentication which would have required access to plaintiff's personal phone to gain entry to the account. Id. pp. 36-37. GM noted that administrator access could be used to override the multi-factor authentication but that such an event would be logged by the system and "no such entry was noted." Id. Based on this, GM concluded that the only person who could have accessed plaintiff's work email account during the time the "Anonymous" email was sent was plaintiff himself. Id. 37-38.

### 3. Plaintiff's Termination

On November 12, 2023, after receiving Data Core's report directly singling out plaintiff as being responsible for many of the recent hacking incidents, plaintiff was called to a meeting with Mr. Nelligan (DSUMF, ¶ 74; POSUMF. ¶ 74).[18] During the meeting, Mr. Nelligan informed plaintiff that a third-party investigation had found him to be the culprit of some of the latest cyberattacks at the school and as a result, his employment at Baldwin was being immediately

---

[18] Plaintiff denies the entirety of the statement by pointing towards the transcript of Ms. Torres deposition which, aside from a possible discrepancy with the date of the meeting, does not challenge Baldwin's characterization of the evidence (POSUMF, ¶ 74).

terminated. Id. Two days later, Baldwin sent him a letter confirming that he no longer worked for the school (Docket No. 53-25).

### E.      Related Events

After being discharged, plaintiff applied for unemployment benefits with the Puerto Rico Department of Labor ("PRDOL") (PASUMF, ¶ 84; DOSUMF, ¶ 84). As a result, the PRDOL inquired with Baldwin as to the reason for the termination. Id. In Baldwin's response to the form sent by the PRDOL, Ms. Torres stated that plaintiff was fired for having prohibited programs on his work computer such as Tor and VPN (Docket No. 58-4, p. 62). As for the events that led to the termination, Ms. Torres added that there had been cyberattacks at Baldwin and that it received an external report that found that the attacks were made with a computer that was under plaintiff's responsibility. Id. pp. 64-65.[19] On February 19, 2020, following his termination, plaintiff filed a second charge before the EEOC claiming that Baldwin's retaliatory actions against him intensified after his first charge (Docket Nos. 18, ¶ 3; 22, ¶ 3). On April 23, 2020, the EEOC issued a probable cause determination on both charges. Id. And, on August 26, 2020, it issued plaintiff a notice of right to sue. Id.

---

[19] The parties bicker over the language and interpretation of Ms. Torres's response to the PRDOL, yet, puzzlingly, none of them brought the actual document before this court and instead rely on Ms. Torres's deposition testimony as the only evidence of the contents of the statement (PASUMF, ¶¶ 84-86; DOSUMF, ¶¶ 84-86).

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 14

## III.        DISCUSSION[20]

### A.   Title VII

Plaintiff alleges that he was retaliated against in violation of Title VII (Docket No. 18, ¶¶ 53-68), which protects employees from retaliation for having "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the title. Ray v. Ropes & Gray LLP, 799 F.3d 99, 107 (1st Cir. 2015). A retaliation claim may be proven with "direct or circumstantial" evidence. DeCaire v. MuKasey, 530 F.3d 1, 20 (1st Cir. 2009).

Direct evidence refers to a "smoking gun" showing that the decisionmaker "relied upon a protected characteristic" in taking an employment action. PowerComm, LLC v. Holyoke Gas & Elec. Dept., 657 F.3d 31, 35 (1st Cir. 2011). It "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 51 (1st Cir. 2021). The record is devoid of this type of evidence.

Alternatively, a retaliation claim may be pursued relying on the three-stage burden shifting framework drawn from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). Under this framework, plaintiff bears the initial burden of establishing a prima facie case of retaliation. See, Caraballo-Caraballo v. Correctional Administration, 892 F.3d 53, 57 (1st Cir. 2018)(discussing framework). To do so, plaintiff must show that he: (i) "engaged in protected conduct under Title VII;" (ii) suffered an "adverse employment action;" and (iii) the adverse action was "causally connected to the protected activity." Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir.

---

[20] The Amended Complaint includes allegations of both discrimination and retaliation for complaining of the allegedly discriminatory conduct (Docket No. 18). However, in opposition to summary judgment plaintiff presented no opposition to Baldwin's arguments to dismiss the discrimination claim and "voluntarily dismissed" the claim (Docket No. 57, p. 11).

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 15

2009).  The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination.  Id.  For it, plaintiff need only demonstrate that he had a good faith, reasonable belief that the underlying challenged employer's actions violated Title VII.  Id.  An adverse action is one that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate non-retaliatory reason" for its conduct.  Pérez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 31 (1st Cir. 2011).  Should the defendant satisfy this burden, the inference arising from the *prima facie* phase drops from the case.  See, Domínguez-Cruz v. Suttle Caribe Inc., 202 F.3d 424, 430 (1st Cir. 2000)(so noting).  Then the inquiry turns towards plaintiff to show that the proffered legitimate reason is in fact a "pretext for unlawful retaliation." Rodríguez-Severino v. UTC Aerospace Systems, 52 F.4th 448, 462 (1st Cir. 2022).

### 1. Prima Facie Phase

From a bird's-eye view, plaintiff engaged in protected activity after which he was suspended, placed on a PIP and reclassified as nonexempt employee (DSUMF, ¶¶ 20-24, 29, 34, 44-45; POSUMF, ¶¶ 20-24, 29, 34, 44-45).  As a result, he filed a charge with the EEOC and a few months later, before the matter had been resolved, he was let go (DSUMF, ¶¶ 49-50, 71-75; POSUMF, ¶¶ 49-50, 71-75). Yet, upon closer inspection, while plaintiff did technically complain about discrimination over Baldwin's stipend policies, whether he had a "good faith, reasonable belief" for these allegations is doubtful, for he did not have personal knowledge that extra bonuses were actually given to white and/or American employees, but only "imagined" that to be the case (Docket No. 53-1, p. 30); see also, DSUMF, ¶ 31, 33; POSUMF, ¶ 31, 33.  Moreover, the causal connection between his comment and subsequent events is vague at best.  Chronological proximity

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 16

"does not by itself establish causality," particularly if the bigger picture undercuts any claim of

causation.  Alvarado v. Donahue, 687 F.3d 453, 464 (1st Cir. 2012).  Nevertheless, the court will

assume that, overall, plaintiff has made a prima facie showing of retaliation under Title VII.

### 2.  Employer's Showing

Baldwin asserts that it suspended and placed plaintiff on a PIP because of plaintiff's refusal

to perform a task that was reasonably assigned to him, and on account of his disrespectful

comments towards Mr. Rodríguez at the July 1st meeting (DSUMF, ¶¶ 28-29, 44-45). [21]  Further

Baldwin states that it reclassified plaintiff's status to nonexempt, as during that meeting, one of

plaintiff's gripes was that he did not make enough money to be classified as an exempt employee,

and after Baldwin looked at the issue, sought to rectify the matter (DSUMF, ¶ 36).  As for the

dismissal, Baldwin posits that it terminated plaintiff's employment when a third-party

investigation placed him as the culprit of the recent wave of cyberattacks at the school (DSUMF,

¶¶ 71-76).

Insubordination and insulting coworkers, not to mention hacking of Baldwin's network

infrastructure, are all legitimate non-retaliatory grounds for Baldwin's actions reasonably linked

to the proper operation of its business.  See, Muehlhausen v. Bath Iron Works, 811 F.Supp. 15,

18-20 (D. Me. 1993)(that plaintiff insulted a supervisor in front of other employees and engaged

in a "public attack [of his] supervisory capacity" considered "legitimate nondiscriminatory reason"

---

[21] Baldwin's contention that plaintiff refused to take on the second Managebac assignment is a sore point for plaintiff. He routinely denies having refused the assignment (POSUMF, ¶ 21; PASUMF, ¶ 18).  From his perspective, he never declined the assignment because although he repeatedly asserted that it was unfair, he never expressly refused to do the job.  Id.  In plaintiff's own words, his response was: "That I believed that was not fair, that was my answer the entire time, all the way to the end.  And I never refused to perform the job, I just said that I felt that it was very unfair. But I never said that I was not going to do it" (Docket No. 58-2, p. 36).  Plaintiff's position would then beg the question as to how many more times the request should have been made before he would have acceded to perform the task. Plaintiff never expressly accepted the task either, so after repeated attempts it would be reasonable for Baldwin to take his stonewalling as a refusal.

for discharge); Davis v. Joseph J. Magnolia, Inc., 893 F.Supp.2d 165, 171 (D.D.C. 2012)(damage to company property looked on as "legitimate, non-retaliatory reason" for an adverse employment action). Likewise, changing an employee's status from exempt to nonexempt to comply with the law is no more than a proper ground for action. See, Blackie v. State of Me., 75 F.3d 716, 722-725 (1st Cir. 1996)(recognizing validity of employer's decision to modify employees' contractual pay premium in response to determination that employees were not exempt from overtime provisions of Fair Labor Standards Act).

### 3. Pretext for Retaliation

In this light, the presumption attending the prima facie case vanishes, shifting to plaintiff the burden to show that the reasons Baldwin has put on the record are a pretext for retaliation. Pretext "means something worse than a business error." Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005). It involves deceit —a lie— or a made up story "to cover" one's tracks. Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 92 (1st Cir. 2014). Its analysis is "more demanding" than the assessment of whether a prima facie case has been established. Mariani-Colón v. Dep't of Homeland Security, 511 F.3d 216, 222 (1st Cir. 2007). It may be found where the record reveals "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons for its decisions, "that a reasonable factfinder could rationally find them unworthy of credence" and hence infer that the employer did not act for the asserted non-discriminatory reasons but in retaliation for the employee's protected activity. Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011). There is nothing pretextual here.

First, plaintiff alleges a jury could find that Baldwin's explanations for the suspension and PIP pretextual because he did not have previous disciplinary incidents. Id. pp. 15-16. Plaintiff's

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 18

clean record does not mean that any first violation should be automatically tainted with suspicion.

See, Ramos-Santiago v. WHM Carib, LLC, 2017 WL 2062857, *6 (D.P.R. May 11, 2017)("Despite his perfect disciplinary record, [plaintiff] was given the boot. While some could characterize [defendant]'s decision as insensitive, others could say it reflects [defendant]'s appreciation of the gravity of the offense. Whatever the case, these facts do not suggest pretext") aff'd 919 F.3d 66 (1st Cir. 2019).

Second, plaintiff argues that the reason given for the change of status is pretextual because Baldwin never made any efforts to verify if he would then be entitled to unpaid overtime within the last 3 years. Id.[22]  Without more, this not enough to rebut Baldwin's proffered reason for making the change. There is no evidence that Baldwin should have believed that plaintiff was owed overtime nor do the allegations of the operative complaint even mention that plaintiff was owed overtime or wages of any sort. In this context, no rational jury could find weakness, implausibility or incoherence in Baldwin's suspending and placing on a PIP an employee who refused to perform a task which was reasonably related to his job unless he was paid more, all the while humiliating his direct supervisor or in correctly classifying a previously misclassified employee.

Third, plaintiff claims there are conflicting explanations for his termination and that the discrepancy is indicative of pretext (Docket No. 57, p. 22-23). To this end, he points to the Data Core report and the PRDOL unemployment form wherein Ms. Torres allegedly stated that plaintiff was discharged for downloading prohibited apps on his work computer. Id. In particular, he states

---

[22] Plaintiff skirts the issue of his classification and does not address whether his position should have been classified as exempt or non-exempt. Instead, he focuses on Baldwin's belief that he had been incorrectly classified. To plaintiff, Baldwin's belief that he had been incorrectly classified is insincere (and thus pretextual) because it did not look into whether plaintiff would be owed any unpaid overtime (Docket No. 57, p. 16).

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 19

that Ms. Torres did not mention the Data Core reports or the hacking incidents.  Id. p. 21.  In

addition, he claims that there were no official policies on the books banning "Tor" or "VPN"

applications at the school; and that even though these applications had also been installed by other

users at Baldwin, including students and members of staff such as Ms. Torres and Mr. Rodríguez,

plaintiff was the only one to be punished for doing so.  Id.

Ms. Torres did not decide to terminate plaintiff's employment, Mr. Nelligan did (Docket

No. 58-3, p. 107).  Even more, he did not consult plaintiff's termination with Ms. Torres (or Mr.

Rodríguez for that matter) and has consistently expressed that the decision to terminate plaintiff

was based solely on the Data Core report.  Id.  Further, as previously mentioned, Ms. Torres's

statement in the PRDOL form was not submitted into evidence.  Plaintiff's thesis is entirely based

on Ms. Torres's deposition testimony as to her recollection of the statement that she drafted.  So,

plaintiff would have this court deny summary judgment on what can essentially be boiled down to

a game of telephone between: (a) what the document actually stated; (b) what Ms. Torres testified

as to having written in the document; and (c) how plaintiff construes Ms. Torres's testimony about

that statement.

Reviewing Ms. Torres deposition transcript in context and taking her recollection of the

PRDOL form at face value (which is what plaintiff would have the court do if it were to concur

that the alleged disparity exists), Baldwin's account to the PRDOL is hardly inconsistent with its

current version.  Ms. Torres testified that she wrote that plaintiff was "terminated for installing in

his computer prohibited programs" and later elaborated that one of the companies hired to

investigate the wave of cyberattacks at the school had determined that the attacks were made with

"decommissioned computers at the school that were under the responsibility of [plaintiff]."

Clearly, Ms. Torres statement to the PRDOL was paraphrasing the exact conclusions of the Data

Core report which expressed that plaintiff had used "high-risk applications" such as "Tor" and "VPN" to gain access to Baldwin's networks on his work computer which was inoperable because it had been allegedly wiped (Docket No. 53-24, pp. 2-5).

Plaintiff concedes that Mr. Nelligan was the person who made the decision to terminate his employment, and that Mr. Nelligan did not appear to show signs of bias towards him (Docket No. 57, p. 10).  But, he shifts the blame to Mr. Rodríguez, arguing that Rodríguez had a personal vendetta against him which led Rodríguez to develop a scheme to frame plaintiff for the recent cybersecurity troubles it was facing and mislead Data Core into finding plaintiff as the culprit with the ultimate goal of getting him fired by upper management (Docket No. 57, p. 10).  In this way, plaintiff attacks the findings of the Data Core report by pointing towards other purportedly exculpatory evidence; denies Data Core's neutrality by claiming the company had previous ties to Baldwin and Mr. Rodríguez; and suggests that its findings were fabricated and fed to Data Core by the IT director (Docket No. 57, pp. 17-22).

As an example, plaintiff mentions that because he was out on medical leave the week of the attacks, he could not possibly have committed the acts for which Data Core found him responsible (Docket No. 58-9).  He attests that he could not have been the supposed hacker because Baldwin had recently switched to a new network infrastructure which he purportedly never had access to (PASUMF, ¶¶ 69-71).  And, he alleges that Mr. Rodríguez had administrative access to plaintiff's account and alludes to an incident where he supposedly turned off plaintiff's work laptop without his knowledge or consent (PASUMF, ¶¶ 80-81; DOSUMF, ¶¶ 80-81).  Furthermore, plaintiff maintains that Data Core's methodology was flawed, because Carlos García, the person who drafted the report, revealed that many of Data Core's conclusions came from information received from Mr. Rodríguez and were not entirely based on its first-hand review or

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 21

sourcing of the evidence (Docket No. 58-8, pp. 86-87).   From this, plaintiff infers that Mr.

Rodríguez was so inflamed by plaintiff's allegations of discrimination that he convinced Baldwin

to bring Data Core into the fray and mislead it to engineer a report that in turn would frame plaintiff

as the mastermind behind Baldwin's cyberattacks that would lead to his ultimate termination

(Docket No. 57, p. 21).[23]

In all, for plaintiff, Mr. Rodríguez poisoned Baldwin management with his own prohibited

intent through the supposed fabrication of the Data Core report, and, in consequence, turned what

at surface level appears to be not only a neutral but a justified termination, into a retaliatory adverse

employment action under the cat's paw theory.  This theory applies when a plaintiff seeks to "hold

his employer liable for the animus of a supervisor who was not charged with making the ultimate

employment decision."  Staub v. Proctor Hosp., 562 U.S. 411, 415-416 (2011).  On that basis, an

employer may be liable for an otherwise neutral employment action if a supervisor's actions where

"motivated by retaliation" and these acts were the "proximate cause" of the ultimate employment

action.  Theidon v. Harvard University, 948 F.3d 477, 508 (1st Cir, 2020).

Accepting for the sake of argument the plausibility of plaintiff's theory that Mr. Rodríguez

engineered a convoluted conspiracy with the goal of separating plaintiff from his employment, the

record is bereft of evidence that would point towards Mr. Rodríguez's having issues with plaintiff's

national origin or skin color (Docket No. 52-6, p. 3).  And there is no evidence that he would take

issue with plaintiff's allegations of discrimination given that they were related to Baldwin's

stipends, a matter that did not involve him.  Even if, again for the sake of argument, the court were

to meet plaintiff's conspiracy theory halfway and seriously entertain the thought that Mr.

---

[23] All this from an individual (Mr. Rodríguez) whom plaintiff believed to be unqualified for the IT Director position and unable to answer "simple technical questions" (Docket No. 58-2, pp. 24-25).

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 22

Rodríguez could be harboring a deep-seated grudge against plaintiff, based on the undisputed

evidence in this case, there is no record support to validly infer that any such grudge would have

been based on plaintiff's race, skin color, national origin or allegations of discrimination.  Rather,

the only reasonable conclusion is that any personal vendetta Mr. Rodríguez might have had against

plaintiff would have arisen out of plaintiff's publicly questioning his competency at the July 1st

meeting.  On this, plaintiff's testimony reveals that the tenor of the meeting changed not when he

made the allegations of discrimination, but when he began to berate his then supervisor,

challenging him to a battle of technological wits.[24]

      In the end, plaintiff's conspiracy theory, stripped of its artifice, is nothing more than a red

herring.  Plaintiff's innocence or guilt as to the Fall 2019 hacking incidents at Baldwin are not a

material issue in this case.  Likewise, whether Data Core's conclusions are accurate, is also not a

material issue.  To carry his burden of establishing that Baldwin's stated reason for terminating his

employment (i.e. that a third-party investigation concluded he was hacking the school's network)

is naught but a pretext for retaliation, what is ultimately at issue is whether Baldwin's decision to

terminate plaintiff's employment was in fact motivated by its belief in the Data Core report and

whether such belief was reasonable.  See, Kouvchinov v. Parametric Technology Corp., 537 F.3d

62, 70 (1st Cir. 2008)("After all, it is the decisionmaker's reasonable belief that guides the inquiry,

not whether the employee was or was not guilty of the suspected misconduct").

      From this perspective, plaintiff would need to show there is a genuine controversy of fact

that Baldwin did not honestly believe in the Data Core report.  On this endeavor, plaintiff falls

---

[24] In plaintiff's own words: "And I made my claim again.  I said '[the IT systems] are breaking down because you don't have the proper expertise.'  After that I saw that he was visibly, you could notice that he was upset" (Docket No. 53-1, p. 21).

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 23

short.  It would have been entirely reasonable for any employee to be immediately terminated after

what on all fronts appeared to be an independent inquiry concluding that he had caused several of

the cybersecurity incidents at the school.  Additionally, there is no evidence that the investigation

was brought to directly target plaintiff.

What spurred Baldwin into contacting GM, Data Core and even the FBI, was a real concern

that it could be at the center of a cybersecurity crisis potentially compromising sensitive student

data and financial information (Docket No. 58-3, pp. 93-98).  Moreover, Baldwin did not discuss

the Data Core report with Mr. Rodríguez and requested that he remain at a distance from the Data

Core and GM investigations because he was also supposed to be under the scope of both.  Id. p.

55.  To that point, Mr. Nelligan stated that "anybody who was named in the report would have

been subject to termination" even if it were Mr. Rodríguez himself.[25]  Under these circumstances

, plaintiff's Title VII retaliation claim must be dismissed.

### B.     Law 115

Plaintiff alleges that he was discriminated against in violation of Law 115 (Docket No. 18,

¶ 1).  In line with Title VII, Law 115 prohibits employers from retaliating against employees "for

engaging in protected activities."  Salva v. Eagle Global Logistics, 2006 WL 2685109, *4 (D.P.R.

Sept. 18, 2006).  These statutes are coterminous.  See, Vélez v. Jansson Ortho, LLC, 467 F.3d 802,

809 (1st Cir. 2006)(focusing on the symmetry between Title VII and Law 115).  On that basis,

---

[25] Plaintiff questions this general notion by pointing to Baldwin's conclusions that 2 other users whose account had sent suspicious emails were in fact compromised, while with plaintiff it concluded that the suspicious email was sent "by the actual user" (Docket No. 69, p. 20).  As evidence of this supposed double standard plaintiff includes an email from Google Support that states that all 3 accounts show evidence that the emails were sent by actual users and not just plaintiff's (Docket No. 58-7).  However, that these users' suspicious emails were external while plaintiff's was internal, was not Baldwin's conclusion, it was GM's (Docket No. 53-21).  Yet, contrary to Data Core, plaintiff does not attempt to cast the same degree of aspersions on GM's report.

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 24

courts have traditionally treated "the two claims the same." Id. In fact, plaintiff merges his

arguments under both statutes (Docket No. 57, p. 25). And, because he failed under Title VII, he

fails under Law 115. See, López-Hernández v. Terumo Puerto Rico LLC, 64 F.4th 22, 33 (1st Cir.

2023)(affirming dismissal of Law 115 claims "given the symmetry between the anti-retaliation

provisions under Title VII and Puerto Rico Laws"); Uphoff Figueroa v. Alejandro, 597 F.3d 423,

433 (1st Cir. 2010)(judgment as a matter of law on Law 115 claim was warranted after jury rejected

retaliation claim under federal law). As a result, plaintiff's Law 115 claims must be dismissed.

See, Ramos v. Vizcarrondo, 2020 WL 13519219, *1 (1st Cir. July 29, 2020)(Law 115 retaliation

claim dismissed on the merits after dismissal of ADEA retaliation claim).

### C.    Law 80

#### 1.  General Principles

Plaintiff alleges that he was wrongfully discharged in violation of Law 80 (Docket No. 18,

¶¶ 69-75). Law 80 makes private-sector employers liable for payment of an indemnity to

employees hired for undefined term who are discharged without just cause. See, Article 1 of Law

80, P.R. Laws Ann. tit. 29, § 185a (stating coverage and payment obligation). The statute contains

a general definition of just cause and provides guidance on the application of this concept through

various examples such as employee misconduct and performance, as well as downsizings and

shutdowns. See, Article 2 of Law 80, P.R. Laws Ann. tit. 29, § 185b (setting forth general

definition and examples).[26]

---

[26] The examples include: (a) a pattern of improper or disorderly conduct by the employee, (b) the attitude of the
employee of not performing his work in an efficient manner, or of doing it belatedly and negligently or in violation of
the standards of quality of the product produced or handled by the establishment, (c) the employee's repeated violations
of the reasonable rules and regulations established for the operation of the establishment, provided a written copy has
been opportunely furnished to the employee, and (d) three other grounds related to shutdowns, restructurings, and
downsizings. See, Article 2 of Law 80, 29 P.R. Laws § 185b. The examples are not, and are not intended to be, "a
code of conduct containing a list of clearly defined offenses with their corresponding penalties for each case, whether

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 25

Under Law 80, a just discharge is one in which the employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to its business' operation. See, Echevarría v. AstraZeneca Pharmaceutical LP, 856 F.3d 119, 140 (1st Cir. 2017)(stating proposition). By contrast, a discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment is not considered just. Id. If the discharge is considered just, "no discharge indemnity payment is due" and the action must be dismissed. Rosado-Mangual v. Xerox Corp., 2019 WL 7247776 at *12 (D.P.R Dec. 27, 2019).

**2.  Evidentiary Framework**

Law 80 employs a burden shifting framework akin to that employed in Title VII cases. See, Lahens v. AT&T Mobility Puerto Rico, Inc., 2020 WL 7407258, *1 (D.P.R. Dec. 17, 2020)(so stating). Plaintiff bears the initial burden of alleging unjustified dismissal and of proving termination. See, García-García v. Costco Wholesale Corp., 878 F.3d 411, 420 (1st Cir. 2017)(describing framework). If the employee meets this burden, the burden shifts to the employer to show, by a preponderance of the evidence, that the discharge was justified. Id. From this frame of reference, plaintiff met the initial burden.

At termination, plaintiff had been employed for close to 15 years; there is no controversy that his employment terminated; and he alleged that the employment terminated without just cause (Docket No. 18, ¶ 69-75). In turn, Baldwin presented evidence that the decision to terminate plaintiff's employment was based on plaintiff's hacking of Baldwin's email and other network

---

it be a reprimand, suspension, or dismissal." Rivera-Cartagena v. Wal-Mart Puerto Rico, Inc., 802 F.Supp.2d 324, 348 (D.P.R. 2011).

infrastructure.  Baldwin investigated the situation and had an honest, reasonable basis to believe that plaintiff had incurred in that conduct.  Moreover, the investigation was not targeted towards plaintiff, as companies were hired with the purpose of performing an independent review of the cyberattacks at Baldwin.  So, Baldwin's decision to terminate plaintiff can hardly be considered to have been made out of whim.  On the contrary, Baldwin put forward considered, non-arbitrary grounds for termination, that are reasonably linked to Baldwin's operations.  As such, it established just cause for the dismissal.

Faced with this reality, to withstand summary judgment plaintiff had the burden to rebut Baldwin's showing.  To satisfy this burden, plaintiff "was required to do more than cast doubt on the defendant's proffered reason for his discharge."  Costco Wholesale Corp., 878 F.3d at 421 (internal citations omitted).  Further, because the "just cause" inquiry focuses not on the objective veracity of the employer's action but on the employer's reasonable belief," plaintiff had to call attention to probative evidence that Baldwin did not genuinely believe in or did not in fact terminate him for the reason given.  Echevarría, 856 F.3d at 140.

### 3.  Plaintiff's Rebuttal

Plaintiff essentially puts all his eggs in his Title VII retaliation basket.  In opposition to summary judgment as to Law 80, he incorporates his Title VII line of argumentation and posits that, on that basis, so too would his Law 80 cause of action survive summary judgment (Docket No. 57, pp. 23-24).  To plaintiff's way of thinking, because he asserts that Baldwin's justification was pretextual, then he "has raised a triable issue of fact as to whether defendant has complied with Law 80."  Id. p. 24.  As mentioned earlier, however, the "just cause" inquiry focuses not on the objective veracity of the employer's action but on the employer's reasonable belief.  Thus,

plaintiff had to adduce probative evidence that Baldwin did not genuinely believe in or did not in fact terminate him for the reason given.  And, he did not do so.

There is no genuine dispute of the decisionmaker's honestly held the belief that plaintiff used his work computer and IT knowledge to conduct cyberattacks on its network.  See, Rosado-Mangual, 2019 WL 7247776,  *18 (pointing out in dismissing Law 80 claim that "in the event an employee is discharged based on a complaint lodged by another employee, the focus turns on the extent to which the employer reasonably believed the complaining employee's allegation an acted on it in good faith or, to the contrary, did not believe the co-employee's allegation and used it as a pretext to carry out an otherwise wrongful discharge").  A perceived violation suffices to establish that "the employer did not terminate the employee on a whim rather than for a sensible business-related reason."  Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas, 982 F.3d 20, 34 (1st Cir. 2020); Costco Wholesale Corp., 878 F.3d at 420; Echevarría, 856 F.3d at 140.  Considering this state of affairs, the discharge here was not arbitrary or for legally prohibited reasons, but for grounds linked to the proper and normal operation of the business.  As a result, the Law 80 claim must be dismissed.

**D.   Law 100**

Law 100 provides a cause of action for employees who have been discriminated against due to their "race, color . . . or national origin . . .," among other protected classes.  P.R. Laws Ann. tit. 29, § 148.  As alluded to earlier, plaintiff voluntarily dismissed his claims of discrimination, focusing instead on the retaliation cause of action (Docket No. 57, p. 11).   Thus, plaintiff's Law 100 claims must be dismissed without need for further elaboration.

Medero-González v. The Baldwin School of Puerto Rico, Inc.,
Civil No. 20-1527 (PAD)
Opinion and Order
Page 28

**E.**      **Damages**

Plaintiff claims entitlement to damages under Puerto Rico's general tort statute, Art. 1802 of

the Civil Code of 1930 (Docket No. 18, ¶¶ 76-80).  To the extent a specific labor-employment law

covers the conduct for which plaintiff seeks damages, he is barred from relying on that same

conduct to sustain a tort claim.  See, Reyes-Feliciano v. Marshalls, 159 F.Supp.3d 297, 310 (D.P.R.

2016)(articulating formulation).   There is no tortious conduct separate from that covered by

employment legislation alleged here.  On that basis, plaintiff's tort claims must be dismissed.  See,

Franceschi-Vázquez v. CVS Pharmacy, 183 F.Supp.3d 333, 344-345 (D.P.R. 2016)(dismissing

tort claim because plaintiff failed to point to tortious conduct separate from that covered by

employment laws); Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc., 806

F.Supp.2d 503, 508-509 (D.P.R. 2011)(dismissing tort action in absence of distinct factual

allegations sufficient to support a tort claim separate from labor law claims).

**IV.**      **CONCLUSION**

For the reasons stated, Baldwin's motion for summary judgment (Docket No. 54) is

GRANTED and the case DISMISSED.  Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2023.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO HERNÁNDEZ
U.S. DISTRICT JUDGE